# AFFIDAVIT OF SPECIAL AGENT ANDREW D. NAMBU

I, Andrew D. Nambu, being first duly sworn, hereby depose and state as follows:

# INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been so employed since 1999.  Since in or about 2003, I have been assigned to a Counter Terrorism Squad and the Joint Terrorism Task Force in the FBI's Boston Field Office, and, since 2010, to the same duties in the FBI's Worcester Resident Agency.  From 1999 to 2003, I was assigned to the Health Care Fraud Squad of the Boston Field Office.  During my employment at the FBI, I have investigated federal criminal violations related to international terrorism, health care fraud, money laundering, fraud and economic/white collar crimes, among others.  I have submitted affidavits in support of federal search warrants and criminal complaints and have participated in the execution of numerous search warrants.

2.      The FBI has been investigating, *inter alia*, possible violations of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud), and 18 U.S.C. § 1957 (Money Laundering) based on a series of events that began in or around December 2013 and continued at least until in or around October 2014.

3.      I submit this Affidavit in support of the issuance of an arrest warrant for, and a criminal complaint against, ASHOKKUMAR PATEL, a/k/a "Andy Patel" ("PATEL"), charging him with one count each of Wire Fraud, Conspiracy to Commit Wire Fraud, and Money Laundering (the "Subject Offenses").  As described below, there is probable cause to believe that from in or about December 2013 to in or about October 2014, PATEL committed the Subject Offenses.

4.     The facts in this Affidavit come from my personal observations, witness interviews, my training and experience, and information obtained from other agents, law enforcement officers and witnesses.  This Affidavit is intended to show that there is sufficient probable cause for the requested warrant, and does not set forth all of my knowledge about this matter.  Statements of individuals that I describe herein are set forth in substance or in part unless I otherwise specifically indicate.

## RELEVANT STATUTES

5.     Generally, Title 18, United States Code, Section 1343 makes it illegal for any person, "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, [to] transmit[] or cause[] to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice."

6.     Generally, Title 18, United States Code, Section 1349 makes it illegal for any person to attempt or conspire to commit any offense under chapter 63 under Title 18 of the United States Code, including without limitation, wire fraud.

7.     Generally, Title 18, United States Code, Section 1957 makes it illegal for any person to "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished . . . ."  18 U.S.C. §1957(a).  A "monetary transaction" is "the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument . . . by, through, or to a financial institution . . . ."

## PROBABLE CAUSE

A.    Definitions

8.    As used in this Affidavit, the following terms have the following meanings:

a.    "Call center" means an organization utilized in various schemes designed to defraud or extort residents of the United States by misleading them into sending money by means of a "prepaid stored value card" to individuals involved in the conspiracy.   I am aware from my investigation that many of these "call centers" are based in India;

b.    "Caller" refers to an individual who works for a "call center" and places calls to individuals in the United States to attempt to mislead the individuals into sending money through various schemes designed to defraud or extort residents of the United States;

c.    "IRS Scam" refers to a fraudulent or extortionate scheme whereby "callers" from a "call center," claiming to be IRS agents or employees, contact an individual living in the United States by telephone, and mislead those individuals ("victims") into believing that they owe money to the IRS and will be arrested if they do not immediately pay the alleged taxes and monies owed;

d.    "Prepaid stored value card" refers to cards that have monetary value stored on the card itself (not in an external account maintained by a financial institution) which is placed onto the cards by purchasers and can be used to fund "reloadable debit cards."  There is generally a fee to purchase the "prepaid stored value cards" which is paid for by the purchaser at the time of purchase;

e.    "Reloadable debit card" refers to cards that have monetary value without being associated with a personal bank account and can be used like a debit card to

make purchases.  "Reloadable debits cards" are also known as "general purpose reloadable" or "GPR" cards.  There is generally a fee to purchase the "reloadable debit card" which is paid for by the purchaser at the time of purchase, and in some cases a minimum load amount is required at the time of purchase;

f.      "Runner" refers to an individual involved in the alleged wire fraud conspiracy who is responsible for one or more of the following tasks, either alone or in conjunction with other individuals:  purchasing or obtaining "reloadable debit cards," registering the "reloadable debit card" and/or providing the "reloadable debit card" serial number to other co-conspirators to register the "reloadable debit card" using the personal identifying information ("PII") of real individuals; purchasing money orders using "reloadable debit cards" and depositing the money orders into bank accounts belonging to themselves or other real individuals;

g.      Green Dot Corporation ("Green Dot") was an entity that, *inter alia*, sold both "prepaid stored value cards" commonly known as MoneyPak cards, as well as "reloadable debit cards" ("Green Dot Debit Cards").  Prior to being able to load funds onto a Green Dot Debit Card, the card must first be registered or activated with PII, including name, address, telephone number, date of birth and social security number.  Registration or activation can be accomplished either online or via telephone.  At the time of registration or activation, Green Dot verifies the name, date of birth and social security number provided by the individual registering or activating the card.  If Green Dot is unable to verify the provided name, date of birth and social security number, Green Dot places the card into a

status whereby additional funds cannot be loaded onto it.  When a Green Dot Debit Card is purchased, the store where the purchase is made scans the barcode on the card and one of Green Dot's servers, which are located in California and Nevada, is notified of the purchase.  When the card is registered or activated, PII is required and the Green Dot servers in California or Nevada are contacted to verify the PII provided.  In addition, when the Green Dot Debit Card is used to make a purchase, a PIN number is required to be entered by the user of the card, and upon entry of that PIN number, Green Dot's servers are notified of the purchase to ensure that there is an adequate balance on the card to complete the purchase;

h.      "Spoofing" is a mechanism whereby "callers" intentionally falsify the information transmitted to a recipient's caller ID to disguise the "caller's" identity, location or both.  For example, the "call centers" utilized a "magicJack" device which enabled "callers" to place telephone calls using "Voice Over Internet Protocol ("VoIP") either via computer or regular telephone and also enabled the "call center" to choose the telephone number for the magicJack that would appear on the recipient's caller ID.  In the IRS Scam, the "callers" from the "call centers" on some occasions spoofed the IRS toll-free number on the caller ID so as to make it appear to the recipients of the calls that the call was coming from the IRS.

B.      General Allegations

9.      During the course of my investigation, I have learned that India-based "call centers" utilized various schemes to fraudulently obtain money from individuals to which they are not entitled, including the "IRS Scam."

10.     In the "IRS Scam," "callers" from the "call centers" contacted the victims by telephone, informed them (falsely) that they owed back taxes and threatened them with imminent arrest and seizure of assets unless the victims immediately paid their "taxes" and "fines."  The "callers" instructed the victims that they could avoid imminent arrest by going to a store and purchasing a "prepaid stored value card" to make payments they purportedly owed.  The "callers" instructed the victims to purchase and load the "prepaid stored value cards" with as much money as the victims had available, and in some instances instructed the victims to acquire more cash from their banks or automated teller machines ("ATMs") in order for them to purchase and load additional "prepaid stored value cards."  The callers kept the victims on the telephone while the victims went to various locations to purchase a "prepaid stored value card," such as "MoneyPak," "Reloadit," and "Vanilla," among other brand names.

11.     After the victims purchased one or more "prepaid stored value cards," the "callers" instructed the victims to provide the "callers" with the serial number(s) for the card(s).

12.     Once the "caller" had the serial number(s) from the victims' "prepaid stored value cards," members of the conspiracy transferred the money loaded by the victims onto the "prepaid stored value cards" onto "reloadable debit card(s)" in the name(s) of real individuals (but who are not the victims) who do not appear to know that their PII is being used to register a "reloadable debit card."[1]  At the point that the money from the "prepaid stored value card" was

---

[1] As noted in Paragraph 52, below, the FBI interviewed numerous individuals whose names and other PII were used to register various Green Dot Debit Cards that were connected through Green Dot records to

loaded onto the "reloadable debit card," the victims' money was converted to members of the conspiracy involved in the IRS Scam.

13.     After the "reloadable debit card" was loaded with the victims' money from the "prepaid stored value cards," the "reloadable debit card" was used in a short time frame to purchase money orders, subsequently made out to various real individuals.  The money orders, in turn, were deposited into bank accounts in the names of other real individuals,[2] and subsequently those funds typically were further transferred to other bank accounts, withdrawn, or sent overseas.

14.     The IRS Scam, including the instruction to the victims to remain on the telephone with the "caller" during the transactions, was designed to quickly move the victims' funds from the "prepaid stored value cards" to "reloadable debit cards" (and thus to facilitate the conversion of the money to members of the conspiracy), and then from the "reloadable debit cards" to money orders, so that the victim could not report the fraud in time to recover their funds.

15.     "Callers" or other members of the conspiracy regularly communicated with other co-conspirators, often using smart phone applications such as WhatsApp, a cross-platform mobile messaging application (also known as an "app") which allows users to exchange messages.  "Callers" or other members of the conspiracy advised the co-conspirators which "reloadable debit cards" had been loaded with victims' funds, the balances of those "reloadable debit cards," the face value amounts for the money orders to be purchased, and the banks and bank account numbers in which the money orders were to be deposited.

---

PATEL's Phone.  All 108 individuals advised that they did not authorize anyone to open a Green Dot Debit Card using their names or PII, which I submit suggests that these individuals may have been the victims of identity theft.

[2] The individuals into whose bank accounts the money orders were deposited may be additional co-conspirators and/or may be unknowing participants in the scheme.

C.      Background of the Investigation

16.      This investigation began in approximately February 2014 after an individual,

V.A., a 65-year-old retired, disabled internal medicine physician who lived in Shrewsbury,

Massachusetts, reported that she was a victim of the IRS Scam.  V.A. reported that the IRS Scam

began in or around December 2013 when she received voicemail messages from a caller

purporting to be an attorney from either the "Central Investigation Bureau" or "Central

Investigation Department."  The caller left a message for V.A. to call him back at phone number

(202) 800-3398 (the "-3398 number"), stating the matter was urgent.  V.A. did not initially return

the telephone call.

17.      A few days later, V.A. answered a call on her cell phone from the same -3398

number.  The caller, who identified himself as an attorney with the United States Government,

told V.A. there was a warrant issued for her arrest and stated that V.A. would have to pay legal

fees within the hour to avoid arrest.  Although V.A. did not believe she had done something for

which she would be arrested, V.A. also believed that the caller was an attorney with the United

States Government as the caller knew her married name, her maiden name she was currently

using, her date of birth, her Social Security Number, and her address and telephone numbers.

18.      The caller advised that V.A. could pay her legal fees by purchasing Green Dot

MoneyPak cards, a type of "prepaid stored value card," ("MoneyPak cards"), and by doing so,

avoid imminent arrest.  V.A. advised the caller that she had never purchased MoneyPak cards

and did not know how or where to purchase them.  The caller directed V.A. to remain on her cell

phone and he would instruct her where to go, how to purchase the MoneyPak cards, and what to

do next.  V.A. began to cry, stating that she was in physical pain from her medical condition and

had difficulty driving in her car.  The caller insisted that V.A. immediately purchase the

MoneyPak cards.  Fearing imminent arrest, V.A. followed the instructions that the caller relayed as she drove.  The caller directed V.A. to a retail store to purchase a MoneyPak card using cash, and further directed V.A. to scratch off the silver film on the back of the card to reveal the card's unique serial number, and to provide the caller with the card's serial number.  V.A. purchased approximately 26 MoneyPak cards that day which were loaded with $20,000 of V.A.'s money. V.A. provided each card's serial number to the caller.  In order to purchase and load the cards, V.A. paid $128.70 in purchase and service fees.

19.     Between approximately December 20, 2013 and February 7, 2014, V.A. continued to receive several similar calls each week, and sometimes received multiple calls on a single day.  Some of the callers spoke with accents.  One of the callers spoke with an Indian accent, and at one point spoke to V.A. in Hindi, a dialect which V.A. also speaks.  During one or more of the conversations, V.A. was told that her legal problems were based on unpaid taxes. V.A. was sure she paid all of her taxes, but she continued to be threatened with imminent arrest and seizure of her assets, so she complied with the callers' demands.

20.     Between approximately December 20, 2013 and February 7, 2014, V.A. spent approximately $85,824.50 in order to purchase and load MoneyPak cards at the direction of the callers, and provided the callers the serial numbers of all MoneyPak cards purchased.  Funds from all of V.A.'s MoneyPak cards were transferred, either by telephone and/or computer, to various Green Dot Debit Cards.  These Green Dot Debit Cards were then used to purchase MoneyGram and Western Union money orders at various retail stores, primarily in Florida.

21.     During the course of my investigation, I obtained records from Green Dot related to MoneyPak cards reported to FBI in Worcester as having been purchased by victims of the IRS Scam, which included records about victims' MoneyPak cards, Green Dot Debit Cards that were

funded (in whole or in part) from victims' MoneyPak cards, and telephone numbers and Internet

Protocol addresses ("IP addresses")[3] that Green Dot's records had recorded as having conducted

some transaction or inquiry related to either the MoneyPak cards or related Green Dot Debit

Cards, or both.  In or about April 2015, I identified PATEL's cellular telephone number (773-

791-0934) as having conducted a transaction or inquiry on a Green Dot Debit Card that had been

funded, in part, with MoneyPak cards purchased by J.W., as described further in Paragraphs 41

through 50, below.  As described herein, I believe that PATEL is a "runner" in this conspiracy.

22.     Records subpoenaed from AT&T indicate that PATEL was the subscriber for

AT&T wireless telephone number 773-791-0934 ("PATEL's Phone") from March 27, 2012

through July 31, 2015 (the date of the response from AT&T).  According to the AT&T records,

PATEL used an address of 15 Washington St., Apt. 3, Plainville, MA 02762 for billing purposes.

I located PATEL at 15 Washington St., Apt. 3, Plainville, MA in August 2015.  According to the

AT&T records, the user of PATEL's Phone is "Andy Patel" with an address of 1762 N.

Clybourn Ave., Chicago, IL 60614.  I am aware from my investigation that 1762 N. Clybourn

Ave., Chicago, IL is the address for a Subway sandwich shop franchise and not a residential

address.  I am aware from my investigation that PATEL uses the name "Andy Patel."  I have

viewed a FaceBook profile belonging to "Andy Patel," and recognize the profile photograph

posted on that page as being PATEL, as I have met with PATEL during the course of my

investigation.  PATEL's FaceBook profile name is "Andy Patel" and PATEL's Phone is linked

with that FaceBook page.

23.     I am aware that cellular telephone service providers operate a system of cellular

towers to receive and transmit electronic signals from cell phones.  When cell phone users place

---

[3] IP addresses are a unique string of numbers separated by periods that identify each computer using the
Internet Protocol to communicate over a network.

or receive a call, the cell phone sends an electronic signal to the tower with the strongest signal,

typically the nearest tower.  Service providers generate and retain records which identify the

particular tower to which a user's telephone was connected at the beginning and ending of each

call, thereby identifying the general location where a call is made or received.  Historical cell-site

records identify the cell tower, and in most cases the sector of the cell tower, used to route

communications to or from the target phone.  Taken together with the location of the relevant

cell towers, these records enable a determination as to the general area in which the cell phone

was located at the time that a communication occurred.

24.     During the course of my investigation, the government obtained non-content

historical cell-site information for PATEL's Phone for the period from November 1, 2013

through September 30, 2015, pursuant to 18 U.S.C. §§ 2703(c)(1), (c)(2) and (d).  See Order

dated April 28, 2016, Docket #16-mj-4239-DHH (under seal).

D.     Victims Connected to PATEL

(1)     Victim K.N.

25.     On or about February 27, 2014, an individual, K.N., who resides in Lexington,

Massachusetts, received a voicemail message on his home telephone number from an individual

claiming to be from the IRS and requesting K.N. to call back at phone number (202) 754-8639

(the "-8639 number").  According to the Caller ID on K.N.'s home telephone, the call originated

from telephone number (800) 829-1040, which I know to be the toll free telephone number for

IRS.

26.     The following morning while at work, K.N. received a phone call on his cell

phone from the -8639 number.  K.N. answered the call and an individual who spoke with an

accent and who identified himself as "KEVIN" stated he worked for the IRS and had a warrant for K.N.'s arrest unless he immediately paid penalties via MoneyPak cards.

27.     Fearing arrest unless he cooperated, K.N. followed "KEVIN's" instructions and went to various retail stores to purchase MoneyPak cards.  After purchasing the cards and loading them with his money, K.N. read the serial numbers on the back of the cards to "KEVIN" as instructed.  In the background, K.N. heard individuals speaking what he believed was either Hindi or Gujarati, both dialects spoken in India that were different than the dialect K.N. speaks.

28.     On or about February 28, 2014, between approximately 9:00 a.m. and 3:30 p.m., K.N. purchased 20 MoneyPak cards, loaded with either $475.49 (1 card) or $500 (19 cards).  In order to purchase and load these cards, K.N. incurred $99.00 in purchase and service fees.

29.     Green Dot records contain telephone numbers and IP addresses used to transfer the funds loaded into K.N.'s MoneyPak cards onto various Green Dot Debit Cards, to activate these Green Dot Debit Cards and/or to make balance inquiries for these Green Dot Debit Cards. In reviewing this information as compared to information received from Green Dot for V.A.'s MoneyPak cards, I noticed that telephone number 786-619-0911 was used on February 6, 2014 for a Green Dot Debit Card which one or more of V.A.'s MoneyPak cards had loaded and also was used on February 28, 2014 for a Green Dot Debit Card which one or more of K.N.'s MoneyPak cards had loaded.  I believe this information supports the inference that the same group of co-conspirators were involved with both V.A. and K.N.

30.     K.N. purchased two of the MoneyPak cards at approximately 1:53 p.m. on February 28, 2014 at CVS Pharmacy located at 1735 Massachusetts Avenue, Lexington, MA. The serial numbers for those cards were 643 733 1790 3072 and 724 511 6298 6041.  Each of these two MoneyPak cards was loaded with $500.

31.     On February 28, 2014, at approximately 2:41 p.m., the $500 from each of the two MoneyPak cards referenced in Paragraph 30 was transferred onto Green Dot Debit Card 4250-3230-1690-9165 (the "-9165 Debit Card").

32.     The -9165 Debit Card was purchased on or about February 27, 2014 at approximately 8:17 p.m. at a Dollar Tree located at 935 Grafton Street, Worcester, Massachusetts (the "Grafton Street Dollar Tree").   Historical cell-site information for PATEL's Phone indicates that PATEL's Phone made or received a telephone call in the vicinity of the Grafton Street Dollar Tree at approximately 8:27 p.m. on February 27, 2014.[4]  Based upon this data, I believe PATEL was in the area of the Grafton Street Dollar Tree around the time that the -9165 Debit Card was purchased.   The -9165 Debit Card was activated on February 28, 2014 at approximately 2:12 p.m. using PII for a female residing in Maryland.

33.     On February 28, 2014, at approximately 2:59 p.m., within approximately 18 minutes of K.N.'s funds from the two MoneyPak cards described above being transferred to the -9165 Debit Card, the -9165 Debit Card was used to make a purchase at Walmart #2158 located at 200 Otis Street in Northborough, Massachusetts (the "Northborough Walmart").   The Walmart purchase was for three MoneyGram money orders[5] bearing serial numbers 020542355749, 020542355750 and 020542355751 (the "-749 through -751 MoneyGram Money Orders"), each in the amount of $820.50, for a total of $2,463.60 including fees associated with their purchase.

---

[4] During this time period, I believe PATEL may have working at a Subway sandwich shop located at 897 Grafton Street in Worcester.

[5] I am aware from my investigation that the money orders purchased using the "reloadable debit cards" generally were for amounts of $1000 or less.  I am also aware from my investigation that at least during the period of December 2013 through August 2014, Walmart did not require identification from individuals purchasing money orders provided the cumulative total of the money orders purchased was less than $3000.  It is my understanding that the money orders purchased from funds of victims connected to PATEL, as described herein, fell under these thresholds, and accordingly, no identification was required of the purchaser(s).

The individual who purchased the -749 through -751 MoneyGram Money Orders had physical possession of the -9165 Debit Card, which was swiped through an electronic terminal and whose PIN number was entered at the time of the purchase.  When the -9165 Debit Card was swiped and its PIN number entered to complete the purchase of the -749 through -751 MoneyGram Money Orders, the Green Dot servers located in California or Nevada would have communicated with the electronic terminal at the Northborough Walmart to verify the availability of funds (*i.e.*, from the MoneyPak cards in the case of the -9165 Debit Card).  I submit that this constitutes the basis for a wire fraud charge in violation of Title 18, United States Code, Section 1343.

34.     The individual in the surveillance footage from the Northborough Walmart has characteristics consistent with that of a South Asian male, who is similar in age and appearance to PATEL.  While conducting the transactions, the individual purchasing the money orders is using what appears to be a mobile, hand-held device multiple times before and during the transactions, and it appears that the individual conducted an additional transaction using another debit card or credit card at the same time that he purchased the -749 through -751 MoneyGram Money Orders.

35.     The -749 through -751 MoneyGram Money Orders were all made payable to an individual with the initials H.R.  On the memo line of each money order was written "550 SW Cutoff Worcester MA."  PATEL has a historical address of 557 Southwest Cutoff, Lot 88, Worcester, Massachusetts.

36.     Based upon the historical cell-site information obtained regarding PATEL'S phone, PATEL's Phone made or received telephone calls on February 28, 2014 at approximately 3:04 p.m., 3:23 p.m., and 3:45 p.m. in the area of the Northborough Walmart, the earliest of which was approximately 5 minutes after the -749 through -751 MoneyGram Money Orders

were purchased.  Based upon this data, I believe PATEL was in the area of the Northborough

Walmart around the time that the -9165 Debit Card was used.  Accordingly, I submit that there is

probable cause to believe that PATEL was the individual who purchased the -749 through -751

MoneyGram Money Orders at the Northborough Walmart.

37.     On March 4, 2014, an individual made a deposit totaling $10,000.50 at the Bank

of America branch at the intersection of Greenwood Street and Southwest Cutoff, Worcester,

Massachusetts (the "Greenwood Street BOA") into an account in the name of H.R. with

addresses in Tehran, Iran, Burbank, California and San Francisco, California.  Bank of America

video surveillance shows an individual consistent PATEL's appearance making this deposit.

The deposit consisted of $270 in cash and $9,730.50 in money orders, including the -749 through

-751 MoneyGram Money Orders.  Other money orders included in this deposit had sequential

serial numbers close in sequence to the -749 through -751 MoneyGram Money Orders,

suggesting that the other money orders were also purchased at the Northborough Walmart at the

same time as the -749 through -751 MoneyGram Money Orders were purchased.

38.     I reviewed the surveillance video of the March 4, 2014 deposit and compared the

image of the individual making the deposit to the photograph of PATEL I obtained from the

Massachusetts Registry of Motor Vehicles (the "RMV Photo").  In my opinion, the individual

making the deposit at the Greenwood Street BOA on March 4, 2014 is PATEL.[6]

---

[6] During the course of this investigation, I provided copies of the surveillance footage obtained from the
Northborough Walmart, the surveillance footage obtained from the Greenwood Street BOA, and the
RMV Photo to the FBI's Digital Evidence Laboratory for comparison of the individual depicted in each
of the surveillance videos with the known photograph of PATEL as well as comparison of the jacket worn
by the individual in each of the surveillance videos.  The FBI Digital Evidence Laboratory reached the
following conclusions:  (1) with respect to the comparison of the individual in the surveillance footage
from the Northborough Walmart to the RMV Photo, there was insufficient detail of the questioned
individual" to enable any conclusion as to the identification or elimination of that individual as being
PATEL, (2) with respect to the comparison of the individual in the surveillance footage from the
Greenwood Street BOA to the RMV Photo, despite "multiple similar facial characteristics . . . such as the

39.     In addition, based upon the historical cell-site data for PATEL'S Phone, PATEL's Phone was used to make or receive a telephone call in the area of the Greenwood Street BOA approximately 7 minutes after the surveillance photograph captured the individual making the deposit.  Based upon this data, I believe PATEL was in the area of the Greenwood Street BOA around the time of the described deposit.  Accordingly, I submit there is probable cause to believe that PATEL was the individual who deposited the -749 through -751 MoneyGram Money Orders at the Greenwood Street BOA into an account in the name of H.R.

40.     I submit that this deposit into Bank of America of more than $10,000 in U.S. Currency which was derived from the alleged wire fraud constitutes money laundering in violation of Title 18, United States Code, Section 1957.

*(2)     Victim J.W.*

41.     On or about July 23, 2014, J.W., a 65 year old residing in Worcester, Massachusetts, received a phone call from an individual claiming to be "JOHN MCMILLAN" from the IRS.  J.W.'s Caller ID indicated he was calling from phone number (800) 829-1040, the toll free number for IRS.  "JOHN MCMILLAN" advised J.W. that she had unpaid taxes and she would be arrested unless she immediately purchased Vanilla cards, ReLoadit cards, and Green Dot MoneyPak cards and provided him with the serial numbers from each card.

---

overall shape of the face, nose, eyes, lips, and cheeks, similar cleft chin, hairstyle, hairline, eyebrows, lack of facial hair under the lower lip and a similar loop earring in the left ear," no conclusion could be reached to identify or eliminate the individual being PATEL "Due to the lack of visible individualizing characteristics" in the Greenwood Street BOA surveillance footage, and (3) "[d]ue to insufficient detail" in the Northborough Walmart footage, no conclusion could be reached as to whether the individual depicted in the Northborough Walmart footage was the same as the individual in the Greenwood Street BOA footage, and (4) although the jackets worn by the individual in each of the surveillance videos "share limited class characteristics to include the overall tonality, location of a symbol/mark on the upper left chest and corresponding vertical stripes on the left and right chest and on the left arm of both jackets," due to "limited detail" in the Northborough Walmart footage and the "lack of visible individualizing characteristics, no conclusion could be reached regarding the identification or elimination of the questioned jackets as being the same jacket."

42.     Between July 23, 2014 and July 26, 2014, J.W., fearing arrest, went to various stores in Worcester, Massachusetts and surrounding towns to purchase Vanilla cards, ReLoadit cards and Green Dot MoneyPak cards.  At some point during the second day, "JOHN MCMILLAN" passed J.W. off to his "supervisor" who claimed his name was "MARK MILLER", telling J.W. that because her payments from the prior day were late, she owed additional money that would later be returned to her.  Acting under the direction of both callers, J.W. purchased 63 cards and provided "JOHN MCMILLAN" and/or "MARK MILLER" with the serial number for each of these cards.  The callers told J.W. she had to stay on her cell phone with them throughout all of her purchases, and she could not tell anyone who she was speaking with because of the Patriot Act.  According to J.W., both callers had accents.  J.W.'s total loss during this three-day period, to include cash loaded into the cards and purchase and service fees for the cards, was approximately $44,190.80.

43.     Included among the 63 cards J.W. purchased were the following four MoneyPak cards: 150 547 5135 5694, 882 187 6335 4775, 772 231 5279 1477 and 234 451 4688 0898 (the "Four J.W. MoneyPak Cards").  The Four J.W. MoneyPak Cards were purchased at Rite Aid #10084 in Clinton, Massachusetts on July 25, 2014 at approximately 9:45 a.m., and each was loaded with $500.

44.     On July 25, 2014 at approximately 10:25 a.m., within approximately 40 minutes of J.W.'s purchase of them, the funds from the Four J.W. MoneyPak Cards were used to load Green Dot debit card 4250-3110-2848-7833 (the "-7833 Debit Card").

45.     The -7833 Debit Card was purchased on July 24, 2014 at approximately 3:18 p.m. at CVS #1247 located at 2992 Cranberry Highway, Wareham, Massachusetts (the "Wareham CVS") and was activated the same day using PII for a male residing in Illinois.  Historical cell-

site information for PATEL's Phone indicates that PATEL's Phone made or received telephone calls in the vicinity of the Wareham CVS at 3:11 p.m. and 3:21 p.m. on July 24, 2014. Based upon this data, I believe PATEL was in the area of the Wareham CVS at the time the -7833 Debit Card was purchased.

46.     On July 25, 2014, PATEL's Phone was used to make a transaction and/or inquiry regarding the -7833 Debit Card at approximately 10:49 a.m., 10:50 a.m., and 10:51 a.m.

47.     On July 25, 2014 at approximately 10:53 a.m., the -7833 Debit Card was used to purchase the following three MoneyGram money orders at Walmart #2021, located at 36 Paramount Drive, Raynham, Massachusetts (the "Raynham Walmart") for a total cost, including fees, of $2,487.10:  MoneyGram money orders 020482853427 for $485, 020482853428 for $1,000, and 020482853429 for $1,000.  When the -7833 Debit Card was swiped and its PIN number entered to complete the purchase of the money orders at the Raynham Walmart, the Green Dot servers located in California or Nevada would have communicated with the electronic terminal at the Raynham Walmart to verify the availability of funds.  I submit that this constitutes wire fraud in violation of Title 18, United States Code, Section 1343.

48.     Historical cell-site data for PATEL's Phone confirms that PATEL's Phone was used to make or receive a telephone call in the area of the Raynham Walmart on 10 occasions between 9:51 a.m. and 10:59 a.m. on July 25, 2014, including the three telephone calls from PATEL's Phone described in Paragraph 46 above.  Based upon this data, I believe PATEL was in the area of the Raynham Walmart at the time the -7833 Debit Card was used.

49.     On or about July 28, 2014, MoneyGram money orders 020482853428 and 020482853429 were deposited into a Bank of America account in the name of S.V., who resides in North Hollywood, California.  I am awaiting additional information regarding this deposit.

50.     In reviewing records obtained from Green Dot relating to V.A.'s, K.N.'s, and J.W.'s MoneyPak cards and related Green Dot Debit Cards, I noticed that one IP address (27.109.14.174) was used for one or more transactions and/or inquiries related to V.A. and J.W. (V.A. on April 22, 2014, May 1, 2014 and May 8, 2014 and J.W. on July 22, 2014).[7]  In addition, one telephone number (210-519-6810)[8] was used for one or more transactions and/or inquiries related to K.N. and J.W. (K.N. on February 28, 2014 and J.W. on July 25, 2014).  Accordingly, I believe this evidence supports the inference that the same group of co-conspirators, including PATEL, were involved with V.A., K.N. and J.W.

*(3)     Other Green Dot Debit Cards*

51.     According to records obtained from Green Dot, PATEL's Phone was used to make an inquiry and/or conduct a transaction for 179 Green Dot Debit Cards, including the -7833 Debit Card discussed above (the "179 Green Dot Debit Cards").  According to Green Dot records, the 179 Green Dot Debit Cards had been purchased from locations primarily in Massachusetts, Connecticut and Rhode Island, and were used to purchase money orders totaling

---

[7] These IP addresses could have been used to conduct a transaction and/or inquiry relating to the cards, such as check the balances on the cards, load money onto the cards, activate or register the cards, or conduct any other transaction or inquiry relating to the cards.  The particular action(s) is not known at this time.

[8] The same telephone number was also used on March 20, 2014 for one or more transactions and/or inquiries relating to a Green Dot Debit Card, 4250 3230 1686 3578 (the "-3578 Debit Card"), that had been registered or activated using PATEL's PII.  The -3578 Debit Card was purchased on March 20, 2014 with an initial load of $10.00.  Thereafter, on the same day, 6 MoneyPak cards were used to load another $1694.00 onto the -3578 Debit Card, and the -3578 Debit Card was used to make a purchase totaling $1703.40 at Walmart #5380 located at 1775 Washington Street, Hanover, Massachusetts (the "Hanover Walmart").  I presently do not have precise times as to when the -3578 Debit Card was used at the Hanover Walmart but I am in the process of obtaining that information.  Although it is possible that PATEL was unaware that his PII was used to register or activate the -3578 Debit Card, I believe that this is unlikely or immaterial given that historical cell-site data for PATEL's Phone indicates that PATEL's Phone made or received one or more telephone calls in Hanover, MA on March 20, 2014.  Based upon this data, I believe that an inference can be made that it was PATEL who used the -3578 Debit Card at the Hanover Walmart.

$358,804.53 at various Walmart locations primarily in Massachusetts, Connecticut, and Rhode Island.

52.     The 179 individuals in whose names the cards were registered are believed to be real people whose names, dates of birth and social security numbers were used to register the Green Dot Debit Cards.  To date, the FBI has interviewed 108 of these individuals, the majority of whom have stated that they have never owned or used a Green Dot Debit Card and have never been to Massachusetts, Rhode Island, or Connecticut.  In addition, all 108 interviewed individuals advised that they never authorized anyone to open a Green Dot Debit Card using their PII, never authorized anyone to use a Green Dot Debit Card in their name to make a purchase in Massachusetts, Rhode Island or Connecticut, and did not know or recognize PATEL.

53.     Of the 179 Green Dot Debit Cards, 174 of them were purchased the day prior to being used to purchase money orders, similar to the pattern described above for the -9165 Debit Card and the -7833 Debit Card.  According to Green Dot records, a total of 1,241 MoneyPak cards were used to fund the 179 Green Dot Debit Cards.

54.     During the course of my investigation, an analysis of the historical cell-site data for PATEL's Phone was compared with the location, date and time of the use of 178 of the 179 Green Dot Debit Cards[9] at various Walmart locations to purchase money orders.  This analysis was completed in order to determine whether PATEL's Phone made or received a call around the time that the 178 Green Dot Debit Cards were used to purchase money orders and whether the calls were made or received in the vicinity of the Walmart stores where the money orders were

---

[9] The analysis included only 178 of the 179 cards.  I am in the process of trying to determine which card remains to be compared to the historical cell-site data records for PATEL's Phone.  The earliest use of the 178 Green Dot Debit Cards was approximately March 21, 2014 and the latest use was approximately October 17, 2014.

purchased.   PATEL's Phone made or received one or more calls from a location within

approximately 5 miles[10] of every Walmart where the 178 Green Dot Debit Cards were used to

purchase money orders.  For the vast majority of the 178 Green Dot Debit Cards (approximately

151 of 178), the calls were made or received within 5 minutes of when the Green Dot Debit Card

was used to purchase the money orders, suggesting that PATEL's Phone was in the vicinity of

the Walmart at or near the time those transactions occurred.  Based upon this data, I believe

PATEL was in the area of every Walmart location (primarily in Massachusetts, Connecticut, and

Rhode Island) around the time that each of the 178 Green Dot Debit Cards were used.

*(4)*     _Deposits of Money Orders into PATEL's Bank Account_

55.     A review of PATEL's Bank of America account for the period 11/22/13 through

9/23/2015 identified a number of deposits from unknown sources made at Bank of America,

either at the banking counter or at an ATM.  After excluding deposits from his known

employment at Subway, Uber and Lyft, PATEL's account was credited with approximately

$145,944 from unknown sources during this period.  At least $45,591.33 of the $145,944 in

deposits was from money orders.

56.     Some of the deposits into PATEL's Bank of America account consisted of money

orders (including some that were not in PATEL's name) that were purchased at the same time as

other money orders at various Walmart locations.  By way of example, on April 11, 2014, an

---

[10] I did not determine the precise distance between the respective cell towers that received signals from PATEL's Phone in relation to the Walmart locations where the 178 Green Dot Debit Cards were used to purchase money orders.  Rather, I used an estimate based upon pinpoint locations on a mapping program. Based upon those estimates, PATEL's Phone made or received one or more telephone calls within .5 miles of the Walmart locations where 99 of the 178 Green Dot Debit Cards were used, between .6 and 1.0 miles of the Walmart locations where an additional 31 of the 178 Green Dot Debit Cards were used, between 1.1 and 2.0 miles of the Walmart locations where an additional 38 of the 178 Green Dot Debit Cards were used, and between 2.1 and 5 miles where an additional 10 of the 178 Green Dot Debit Cards were used.

individual purchased three money orders at a Walmart in Quincy, Massachusetts.  The money orders were purchased at approximately 3:36 p.m., using a Green Dot Debit Card, and historical cell-site data for PATEL's Phone indicated that it received and/or made approximately 12 telephone calls in various areas near the Quincy Walmart at between 1:30 p.m. and 3:06 p.m.  One of those money orders, for a total of $1000, was later deposited into PATEL's Bank of America account.  In addition, also on April 11, 2014, an individual purchased three money orders at a Walmart in Hanover, Massachusetts.  The money orders were purchased at approximately 4:38 p.m., using a Green Dot Debit Card, and historical cell-site data for PATEL's Phone indicated that it received and/or made approximately 3 telephone calls in various areas near the Hanover Walmart at between 4:11 p.m. and 4:46 p.m.  One of those money orders, for a total of $1000, was later deposited into PATEL's Bank of America account.

## CONCLUSION

57.     Based upon the foregoing, I respectfully submit that there is probable cause to believe that PATEL, among others, has committed the Subject Offenses, and accordingly, request that the Court issue the requested criminal complaint against and arrest warrant.

Respectfully submitted,

ANDREW D. NAMBU
Special Agent
FEDERAL BUREAU OF INVESTIGATION

Subscribed and sworn to before me on June 28, 2017:

HONORABLE DAVID H. HENNESSY
UNITED STATES MAGISTRATE JUDGE